UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In Re:

Wilford D Miranda,
aka Wilford D Miranda
aka Wilford Miranda, and
Elvira Dominguez,
aka Elvira Alejandrina Dominguez
aka Elvira A. Dominguez,

                    Debtors.

Case No.: 13-38414-JKO

CHAPTER 13

## MOTION FOR RELIEF FROM AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR ADEQUATE PROTECTION & CERTIFICATE OF SERVICE OF NOTICE OF HEARING

Movant Deutsche Bank National Trust Company Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4, its assignees and/or successors in interest ("Movant" herein) hereby files this its Motion for Relief from Automatic Stay or, in the Alternative, for Adequate Protection, and says:

1.      On or about March 19, 2007, Debtors, Wilford D Miranda and Elvira Dominguez ("Debtor"), executed and delivered to First Equity Mortgage Bankers, Inc. a Promissory Note in the original principal sum of $350,000.00 (the "First Note").  As security for all sums due and owing pursuant to the terms of the First Note, on March 19, 2007, Debtor executed and delivered to First Equity Mortgage Bankers, Inc. a mortgage on real property 318 E 41 ST, Hialeah, FL 33013 located in Miami-Dade County, Florida, as more specifically described in the Mortgage (the "First Mortgage").  A true and correct copy of the First Note and First Mortgage are attached hereto as Composite **Exhibit "A"**.

2.      Thereafter, Mortgage Electronic Registration Systems, Inc. assigned all its right, title and interest in and to said note and mortgage to Aurora Loan Services LLC by way of Assignment of Mortgage bearing that date.  Said Assignment is attached hereto as **Exhibit "B"**.

1

3.      Thereafter, Residential Funding Company, LLC assigned all its right, title and interest in and to said note and mortgage to Deutsche Bank National Trust Company Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4 by way of endorsement.

4.      Nationstar Mortgage LLC, servicer for Deutsche Bank National Trust Company Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4, has the right to foreclose by virtue of being the holder and/or owner of the note.

5.      Debtor defaulted under the terms of the First Note and First Mortgage by failing to make the post petition payments required thereunder due on December 1, 2013 and on each month thereafter.

6.      Movant requests that this Court grant relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d)(2) in that the property is worth substantially less than the amount owed to Movant pursuant to the terms of its First Mortgage and that the property is not necessary to an effective reorganization. Therefore, Movant is entitled to relief from the Automatic Stay to commence and complete foreclosure proceedings against the subject Property.

7.      In the alternative, Movant requests that this Court enter its Order granting adequate protection. The position of Movant is in substantial danger of continued impairment by the loss of any equity cushion and by the continued accrual of interest, costs and attorneys' fees beyond the value of the property, all of which would render Movant undersecured and would otherwise impair the value of the mortgaged property.

8.      Movant is informed and believes, and, based upon such information and belief, alleges that title to the subject Property is currently vested in the name of Debtor.

9.      Movant will seek leave of Court to specify any further encumbrances against the subject Property at the time of trial/hearing.

10.    As of February 11, 2015, the outstanding Obligations are:

| Unpaid Principal Balance | $359,743.65 |
|---|---|
| Unpaid, Accrued Interest | $100,111.36 |
| Escrow Advance | $ 68,666.06 |
| Corporate Advance | $ 6,979.50 |
| Less: Partial Payments | ($ 0.00) |
| Minimum Outstanding Obligations | $535,500.57 |

11.    In addition to the other amounts due to Movant reflected in this declaration, as of the date hereof, in connection with seeking the relief requested in the Motion, Movant has also incurred $1,026.00 in legal fees and costs. Movant reserves all rights to seek an award or allowance of such fees and costs in accordance with applicable loan documents and related agreements, the Bankruptcy Code and otherwise applicable law.

12.    The following chart sets forth the number and amount of postpetition payments due pursuant to the terms of the Note that have been missed by the Debtors:

| Number of Missed Payments | From | To | Monthly Payment Amount | Total Missed Payments |
|---|---|---|---|---|
| 7 | 12/01/2013 | 06/01/2014 | $2,496.85 | $17,477.95 |
| 8 | 07/01/2014 | 02/01/2015 | $3,363.51 | $26,908.08 |
| Less partial post-petition payments: | | | | ($0.00) |
| | | | | Total: $44,386.03 |

13.    The Affidavit of Shemar Ursin, an employee of Nationstar, servicing agent for Movant herein, is attached hereto as **Exhibit "C"** and made a part hereof.

14.    See Indebtedness Worksheet attached as **Exhibit "D"**.

15.    Debtors have elected to surrender the subject Property, as evidenced by the Debtors' Chapter 13 Plan

16.    Movant has elected to initiate foreclosure proceedings on the Property with respect to the subject First Mortgage; however, Movant is precluded from proceeding to publish

the necessary notices and commence said foreclosure action during the pendency of this Bankruptcy.

17.     This Movant is informed and believes, and based upon such information and belief, alleges that absent this Court's Order allowing this Movant to proceed with the pending foreclosure, Movant's security will be significantly jeopardized and/or destroyed.

18.     Based upon the foregoing, Movant alleges that Movant is not adequately protected, that the subject Property is not necessary to effectuate Debtor's rehabilitation, and that it would be unfair and inequitable to delay this Movant in the foreclosure of Movant's interest. Movant urges that this Court issue an Order herein permitting this Movant to proceed to a Foreclosure Sale of the Property, including necessary action to obtain possession of the Property.

19.     Robin R Weiner has been appointed by this Court as the Chapter 13 Trustee in this instant Bankruptcy proceeding.  By virtue of her position as Trustee of the estate of Debtor herein, she administers Debtor's Chapter 13 Plan of Reorganization.  To the extent the relief sought herein is granted, Robin R Weiner, Trustee, is bound by any such judgment.

20.     The commercially reasonable fair market value of the subject Property is approximately $155,000.00, as evidenced by the Broker's Price Opinion, dated January 17, 2015 and attached hereto as **Exhibit "E"** and made a part hereof.

21.     The post-petition payment address is: Nationstar Mortgage, LLC PO Box 619094, Dallas TX 75261-9741.

WHEREFORE, Movant, Deutsche Bank National Trust Company Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4, its assignees and/or successors in interest, requests that the Court enter its Order modifying the Automatic Stay to permit Movant to foreclose on property of the Debtor, 318 E 41 ST., Hialeah, FL 33013, which property is subject to the First Mortgage held by Movant, or in the alternative, granting Movant adequate protection to protect the value of Movant's interest in the subject Property and granting such other and further relief as the Court deems meet and just under the circumstances.

4

Movant further requests an Order that, in addition to foreclosure, permits activity necessary to obtain possession of said collateral; therefore, Movant is permitted to engage in loss mitigation activity, including short payoff, short sale and the obtaining of a deed-in-lieu of foreclosure including authorization to negotiate inferior liens. Movant is further permitted to send information regarding these loss mitigation options directly to the debtor.

Movant further requests an Order waiving the 14-day stay described by Bankruptcy Rule 4001(a)(3).

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualification to practice in this court set forth in Local Rule 2090-1(A).

Pursuant to Local Rule 9073-(D), movant's attorney has contacted adverse parties to attempt to resolve the matter without hearing.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Motion for Relief and Notice of Hearing has been furnished this 5th day of MARch 2015 electronically or by U.S. Mail to all of the parties listed on the attached Service List.

By: /s/ Gerard M. Kouri, Jr.
      GERARD M. KOURI, JR., ESQUIRE
Bar No. 375969
Retained Counsel
Gerard M. Kouri, Jr. P.A.
5311 King Arthur Avenue
Davie, Florida 33331
(954) 862-1731
(954) 862-1732 fax
gmkouri@aol.com

Attorneys for Deutsche Bank National Trust Company
Americas, as Trustee for Mortgage Asset-Backed Pass-

Through Certificates, Series 2007-QO4, its assignees and/or successors in interest

Mailing list for Bankruptcy Case No. 13-38414-JKO:

Wilford D Miranda
Elvira Dominguez
14001 NW 4 St #201
Pembroke Pines, FL 33028
Debtor

Electronic mailing list for Bankruptcy Case No. 13-38414-JKO:

**Patrick L Cordero** PCBankruptcyMail@pcorderolaw.com, attorney for Debtors Wilford D Miranda and Elvira Dominguez

**Christopher Giacinto** cgiacinto@logs.com, electronicbankruptcynotices@logs.com

**Geoffrey D Ittleman** geoffrey@ittlemanlaw.com, javiera@ittlemanlaw.com

**Office of the US Trustee** USTPRegion21.MM.ECF@usdoj.gov

**Robin R Weiner** ecf@ch13weiner.com;ecf2@ch13weiner.com


## CERTIFICATE OF CONFERENCE

Movant certifies that prior to filing this order granting relief from automatic stay, an attempt was made to confer with the Debtor's counsel either by telephone, by e-mail or by facsimile, by the following person on the following date and time:

I, Anna Landa, Esquire, of Prober & Raphael left a telephonic message for debtors' counsel Patrick L Cordero, Esq., at the following telephone number: (305) 445-4855 on February 26, 2015 at 1:15 p.m. PST. I did not receive a response by the same time on the second business day. An agreement could not be reached.

/s/ _Anna Landa, Esquire

# SPECIAL NOTICE

**THE FOLLOWING NOTICE IS GIVEN TO YOU IN THE EVENT THAT THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT APPLIES TO THIS COMMUNICATION.**

The following statement provides you with notice of certain rights which you may have by law. Nothing in this statement modifies or changes the hearing date or response time specified in the attached documents or your need to take legal action to protect your rights in this matter. No provision of the following statement modifies or removes your need to comply with local rules concerning the attached documents.

## CONSUMER DISCLOSURE

This communication is made in an attempt to collect on a debt or judgment and any information obtained will be used for that purpose. Please be advised that if you notify Prober and Raphael, ALC within 30 days that all or a part of your obligation or judgment is disputed, then Prober and Raphael, ALC will mail you a written verification of the obligations or judgment and the amounts owed to Deutsche Bank National Trust Company Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4. In addition and upon your request within 30 days, you will be provided with the name and address of the original creditor, if different from the current creditor.

REDACTED

## FLORIDA ADJUSTABLE RATE NOTE
### Payment Option

DOMINGUEZ
Loan
MIN: REDACTED

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

| MARCH 19, 2007 | MIAMI | FLORIDA |
|---|---|---|
| [Date] | [City] | [State] |

318 E 41 ST, HIALEAH, FL 33013
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $350,000.00 (this is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note. Lender is **FIRST EQUITY MORTGAGE BANKERS, INC..** I will make all payments under this Note in the form of cash, check, or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

#### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of 3.500%. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

#### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of MAY, 2007, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

#### (C) Interest Rate Limit

My interest rate will never be greater than 9.950%.

#### (D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

PAYMENT OPTION FL ADJUSTABLE RATE NOTE 10/05
7072.11                                    Page 1 of 6

EXHIBIT "A"

REDACTED

### (E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND FORTY-FIVE HUNDREDTHS** percentage point(s) (**3.450%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on **MAY 1, 2007**. I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **APRIL 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **9130 S DADELAND BLVD #1901, MIAMI, FL 33156** or at a different place if required by the Note Holder.

### (B) Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. **$1,571.66**, until a new Minimum Payment is required as provided below.

### (C) Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of **MAY, 2012**, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

### (E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that

*ED*

PAYMENT OPTION FL ADJUSTABLE RATE NOTE 10/05

REDACTED

would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap. This amount will be my new Minimum Payment. This means that my Minimum Payment may change more frequently than annually. This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

**(G) Required Full Payment**

Regardless of the Payment Change Cap, on the FIRST Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option.

(ii)  Fully Amortized Payment: the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

(iii) 15 Year Amortized Payment: the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

Payment Options will only be available if they are greater than the Minimum Payment.

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and

ED

REDACTED

telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given

PAYMENT OPTION FL ADJUSTABLE RATE NOTE 10/05

REDACTED

by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. DOCUMENTARY TAX

*ED*

PAYMENT OPTION FL ADJUSTABLE RATE NOTE 10/05
☞   7072.11                              Page 5 of 6

REDACTED

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____    3/19/07
- BORROWER - Elvira A. Dominguez - DATE -

*[Sign Original Only]*

PAYMENT OPTION FL ADJUSTABLE RATE NOTE 10/05
7072.11                                    Page 6 of 6

# ALLONGE TO NOTE

**BORROWER NAME:**    ELVIRA A. DOMINGUEZ
318 E 41 STREET
HIALEAH, FL 33013

**NOTE DATE:**          MARCH 19, 2007

**LOAN AMOUNT:**      $ 350,000.00

**WITHOUT RECOURSE
PAY TO THE ORDER OF**

RESIDENTIAL FUNDING COMPANY, LLC
_____

**OFFICER:** _JOEL RODRIGUEZ_

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC
BY _Judy Faber_
Judy Faber, Vice President

**TITLE:**    SECRETARY

**CORPORATION: First Equity Mortgage Bankers, Inc.**

**ALLONGE TO NOTE**

**LOAN NUMBER:** REDACTED

**NOTE DATE:  MARCH 19, 2007**

**LOAN AMOUNT:    $350,000.00**

**NAME:  ELVIRA A. DOMINGUEZ**

**PROPERTY ADDRESS:  318 E 41 ST, HIALEAH, FL 33013**

**ORIGINAL LENDER:  FIRST EQUITY MORTGAGE BANKERS, INC.**

**PAY TO THE ORDER OF:**

**WITHOUT RECOURSE:**

DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE, BY NATIONSTAR
MORTGAGE LLC AS SUCCESSOR SERVICER TO AURORA LOAN SERVICES LLC, AS
SUCCESSOR SERVICER TO RESIDENTIAL FUNDING COMPANY, LLC AS ATTORNEY-
IN-FACT

**BY:** Rory Jaramillo

**TITLE:  ASSISTANT SECRETARY**

## Prepayment Addendum to Note

DOMINGUEZ
Loan REDACTED
MIN:

THIS PREPAYMENT ADDENDUM TO NOTE is made on MARCH 19, 2007 and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of FIRST EQUITY MORTGAGE BANKERS, INC. and is dated as of even date herewith (the "Note").

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

PREPAYMENT PENALTY

Except as provided below, Borrower may make a full prepayment or a partial prepayment of principal at any time without paying any charge. However, if within the first THIRTY-SIX month(s) after the date Borrower executes the Note, Borrower will pay a prepayment penalty in the amount of six month's advance interest on the amount by which the aggregate prepayments (including prepayments occurring as a result of the acceleration of the maturity of the Note) made within any consecutive twelve month period exceeding TWENTY percent (20.000%) of the original principal amount.

If a law, which applies to this loan and which sets a maximum prepayment charge or prohibits prepayment charges, is finally interpreted so that the prepayment charge to be collected in connection with this loan exceeds the permitted limits, then (i) any such prepayment charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, or (ii) if the prepayment charge is prohibited, no prepayment charge will be assessed or collected.

If the terms of this addendum conflict with the terms of the Note, the terms set forth in this addendum shall control and override the terms of the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this addendum.

_____  3/19/07
- BORROWER - Elvira A. Dominguez - DATE -

31.55                    Page 1 of 1

CFN 2007R0327913
OR Bk 25495 Pgs 0780 - 800; (21pgs)
RECORDED 03/30/2007 12:36:57
MTG DOC TAX 1,225.00
INTANG TAX 700.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

After Recording Return To:
FIRST EQUITY MORTGAGE
BANKERS, INC.
9130 S DADELAND BLVD
#1901
MIAMI, FL 33156
ATTN: JOEL RODRIGUEZ

This Document Prepared By:
JOEL RODRIGUEZ
FIRST EQUITY MORTGAGE
BANKERS, INC.
9130 S DADELAND BLVD
#1901
MIAMI, FL 33156
(305) 666-3333

[Space Above This Line For Recording Data]

# MORTGAGE

DOMINGUEZ
Loan
MIN: REDACTED
PIN:

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated MARCH 19, 2007, together with all Riders to this document.
(B) "Borrower" is Elvira A. Dominguez, and Wilford Miranda, wife and husband. Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is FIRST EQUITY MORTGAGE BANKERS, INC.. Lender is a CORPORATION organized and existing under the laws of FLORIDA. Lender's address is 9130 S DADELAND BLVD #1901, MIAMI, FL 33156.
(E) "Note" means the promissory note signed by Borrower and dated MARCH 19, 2007. The Note states that Borrower owes Lender THREE HUNDRED FIFTY THOUSAND AND 00/100 Dollars (U.S. $350,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than APRIL 1, 2037.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
317.47                          Page 1 of 13                          Form 3010 1/01

21

REDACTED

(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider
☐ Balloon Rider     ☐ Planned Unit Development Rider     ☐ Biweekly Payment Rider
☐ 1-4 Family Rider     ☒ Other(s) [specify] **PREPAYMENT**

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "**Escrow Items**" means those items that are described in Section 3.

(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the COUNTY of MIAMI-DADE

LOT 19, BLOCK 4, CHURCHILL DOWNS, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 12 AT PAGE 19, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

which currently has the address of 318 E 41 ST, HIALEAH, Florida 33013 ("Property Address"):

      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
317.47          Page 2 of 13          Form 3010 1/01

REDACTED

additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more

**FLORIDA** -Single Family- Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
317.47                                      Page 3 of 13                                      Form 3010 1/01

REDACTED

Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**FLORIDA** -Single Family- Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

317.47                                    Page 4 of 13                              Form 3010 1/01

*ED*

*wH .*

REDACTED

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and

REDACTED

Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or

REDACTED

regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

REDACTED

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to

FLORIDA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
317.47                                    Page 8 of 13                                    Form 3010 1/01

REDACTED

Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument

REDACTED

must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may

ED
WA.

REDACTED

reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a

REDACTED

Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____  3/19/07    _____  3/9/07
- BORROWER - Elvira A. Dominguez - DATE -    Wifred Miranda

Borrower's Mailing Address: 318 E 41ST STREET, HIALEAH, FL 33013

Signed, sealed and delivered in the presence of:

_____    _____
Witness                              Witness
Maida Peña                           Osvaldo Clerch

REDACTED

[Space Below This Line For Acknowledgment]

STATE OF Florida

COUNTY OF Miami-Dade

The foregoing instrument was acknowledged before me on March 19, 2007, by Elvira A. Dominguez and Wilford Miranda

who is personally known to me or who has produced Valid FL Driver's License as identification.

OSVALDO CLERCH
Comm# DD0579165
Expires 7/30/2010
Florida Notary Assn., Inc

Notary Public

My Commission Expires:

**FLORIDA** -Single Family- Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

317.47                              Page 13 of 13                              Form 3010 1/01

[Space Above This Line For Recording Data]

## PREPAYMENT RIDER

DOMINGUEZ
Loan
MIN: REDACTED

THIS PREPAYMENT RIDER is made this **19TH** day of **MARCH, 2007**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Note (the "Note") to **FIRST EQUITY MORTGAGE BANKERS, INC.** (the "Lender) of the same date and covering the property described in the Security Instrument and located at: **318 E 41 ST, HIALEAH, FL 33013** [Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Except as provided below, Borrower may make a full prepayment or a partial prepayment of principal at any time without paying any charge. However, if within the first **THIRTY SIX** month(s) after the date Borrower executes the Note, Borrower will pay a prepayment penalty in the amount of six month's advance interest on the amount by which the aggregate prepayments (including prepayments occurring as a result of the acceleration of the maturity of the Note) made within any consecutive twelve month period exceeding **TWENTY** percent (**20.000%**) of the original principal amount.

The Note holder's failure to collect a prepayment penalty at the time a prepayment is received shall not be deemed a waiver of such penalty and any such penalty calculated in accordance with this section shall be payable on demand.

Do not sign this Prepayment Rider before you read it. This Prepayment Rider provides for the payment of a charge if you wish to repay the loan prior to the date provided for repayment.

30.1                           Page 1 of 2

*ED*
*HM*

REDACTED

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

3/19/07

- BORROWER - Elvira A. Dominguez    - DATE -

Wilford Miranda    3/19/07

30.1                              Page 2 of 2

## ADJUSTABLE RATE RIDER
### Payment Option

Loan
MIN: REDACTED

THIS ADJUSTABLE RATE RIDER is made this **19TH** day of **MARCH, 2007,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **FIRST EQUITY MORTGAGE BANKERS, INC.** ("Lender") of the same date and covering the property described in the Security Instrument and located at:

**318 E 41 ST, HIALEAH, FL 33013**
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the Note is called the "Note Holder."

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for changes in the interest rate and the monthly payments, as follows:

**2. INTEREST**

**(A) Interest Rate**

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 10/05
7073.12                          Page 1 of 6



REDACTED

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of 3.500%. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the first day of **MAY, 2007**, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

**(C) Interest Rate Limit**

My interest rate will never be greater than 9.950%.

**(D) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND FORTY-FIVE HUNDREDTHS** percentage point(s) (3.450%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on **MAY 1, 2007**. I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **APRIL 1, 2037**, I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 10/05
7073.12                                 Page 2 of 6

REDACTED

I will make my monthly payments at 9130 S DADELAND BLVD #1901, MIAMI, FL 33156 or at a different place if required by the Note Holder.

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $1,571.66, until a new Minimum Payment is required as provided below.

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of MAY, 2012, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

REDACTED

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap. This amount will be my new Minimum Payment. This means that my Minimum Payment may change more frequently than annually. This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

**(G) Required Full Payment**

Regardless of the Payment Change Cap, on the FIRST Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)  **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

Payment Options will only be available if they are greater than the Minimum Payment.

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 10/05
           7073.12                          Page 4 of 6

REDACTED

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. ,

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

OR BK 25495 PG 0800
LAST PAGE

REDACTED

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____    3/19/07
- BORROWER - Elvira A. Dominguez - DATE -

_____    3/19/07
Wilfred Miranda

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 10/05
      7073.12                          Page 6 of 6

(Page 1 of 2)

Recording Requested By:
AURORA LOAN SERVICES

**ASSIGNMENT**

When Recorded Return To:

Rhonda Gall
AURORA LOAN SERVICES
P.O. Box 1706
Scottsbluff, NE 69363-1706

## REDACTED

Miami-Dade, Florida          **CORPORATE ASSIGNMENT OF MORTGAGE**
SELLER'S SERVICING #: REDACTED
OLD SERVICING #: REDACTED

MERS #: REDACTED

Date of Assignment: September 24th, 2008
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. at P.O. BOX 2026, G4318 MILLER ROAD, FLINT, MI 48501-2026
Assignee: AURORA LOAN SERVICES LLC at 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE 69361
Executed By: ELVIRA A. DOMINGUEZ, AND WILFORD MIRANDA, WIFE AND HUSBAND To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR FIRST EQUITY MORTGAGE BANKERS, INC.
Date of Mortgage: 03/19/2007 Recorded: 03/30/2007 In Book/Reel/Liber: 25495 Page/Folio: 0780 as Instrument No.: 2007R0327913 In Miami-Dade, Florida

Property Address: 318 E 41 ST, HIALEAH, FL 33013

   KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage together with the Note or other evidence of indebtedness (the "Note"), said Note having an original principal sum of $350,000.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said Mortgage and Note.

   MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
On September 24th, 2008

By: _____
JOANN REIN, Vice-President

WITNESS                                    WITNESS

_____                  _____
RHONDA GALL                                DEBORAH BACKUS

STATE OF Nebraska
COUNTY OF Scotts Bluff

ON September 24th, 2008, before me, DARLINE DIETZ, a Notary Public in and for the County of Scotts Bluff County, State of Nebraska, personally appeared JOANN REIN, Vice-President, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
DARLINE DIETZ
Notary Expires: 03/22/2010

GENERAL NOTARY-State of Nebraska
DARLINE DIETZ
My Comm. Exp. March 22, 2010

(This area for notarial seal)

## REDACTED

EXHIBIT "B"

Copy

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

Prepared By:   Rhonda Gall,  AURORA LOAN SERVICES 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE 69363-1706 308-635-3500

REDACTED

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA, FORT LAUDERDALE DIVISION

IN RE:

Wilford D Miranda,
aka Wilford D Miranda
aka Wilford Miranda, and
Elvira Dominguez,
aka Elvira Alejandrina Dominguez
aka Elvira A. Dominguez

      Debtors.

ADDRESS: 14001 NW 4 St #201
          Pembroke Pines, FL 33028

SSN: xxx-xx-8877
      xxx-xx-0194

Case No. 13-38414-JKO

CHAPTER 13

AFFIDAVIT OF Shema Ursin
IN SUPPORT OF DEUTSCHE BANK NATIONAL TRUST COMPANY AMERICAS, AS
TRUSTEE FOR MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATE,
SERIES 2007-QO4'S MOTION FOR RELIEF FROM AUTOMATIC STAY OR, IN THE
ALTERNATIVE, FOR ADEQUATE PROTECTION

State of Texas
County of Denton

      BEFORE ME, a Notary Public in and for the State of Texas, personally appeared,
Shema Ursin_____, who, after being first duly sworn on oath, deposes and says;

    1.    I am a/an Assistant Secretary of Nationstar Mortgage LLC
("Nationstar") and am authorized to sign this supplemental declaration on behalf of Nationstar,
servicing agent on behalf of Deutsche Bank National Trust Company Americas, as Trustee for
Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4 ("CREDITOR"). This

**EXHIBIT C**

1

affidavit is provided in support of the Motion for Relief from Stay (the "Motion"), filed contemporaneously herewith.

2.      I have personal knowledge of the facts contained in this declaration as follows: I am familiar with the systems of record that Nationstar uses to record and create information related to the residential mortgage loans that it services, including the processes by which Nationstar obtains the loan information in those systems. While many of those processes are automated, the information manually entered by Nationstar employees relating to loans on those systems is based upon personal knowledge of the information and is entered into the system at or near the time the knowledge was acquired. These computerized records are created and maintained in the regular course of its business as a loan servicer and Nationstar relies on the records in the ordinary course to conduct its business as a loan servicer. These systems also include records of the prior servicer of the mortgage loan.

3.      In connection with my position, as aforesaid, I am familiar with CREDITOR's books and records kept in the ordinary course of business relating to the Note executed by First Equity Mortgage Bankers, Inc., and Mortgage executed by First Equity Mortgage Bankers, Inc., which is the basis for CREDITOR's secured status.

4.      I am competent to make this Affidavit and have personal knowledge of the matters set forth in this Affidavit.

5.      Affiant has direct access to CREDITOR's business records related to the Debtor's Loan with CREDITOR. This affidavit is based upon the loan payment records of the CREDITOR and the Affiant is familiar with these records. These records are regularly maintained in the course of business of the CREDITOR, and it is the regular practice of the CREDITOR to make and maintain these records. These records are compiled and maintained as

2

computer records and are utilized as a matter of daily routine practice in the CREDITOR'S day

to day business. The purpose of these records is to monitor and maintain the Debtors' account

relating to a Note and Mortgage that is owned and held by the CREDITOR. These records

properly reflect loan payments, charges and advances that are noted in the records at the time of

the applicable transactions by persons whose regular duties include recording this information.

6. The Debtor maintains loan account no. XXXX1477 with the CREDITOR. The

Loan represented by this account is secured by a mortgage in the following property, generally

described as 318 E 41 ST., Hialeah, FL 33013, and legally described as follows:

> LOT 19, BLOCK 4, CHURCHILL DOWNS, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOK 12 AT PAGE 19, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

7. The Debtor is in default under the terms of the Note and Mortgage by failing to make

the post petition payments due December 1, 2013 and all subsequent payments due thereunder.

8. As of February 11, 2015, the outstanding Obligations are:

| Unpaid Principal Balance | $359,743.65 |
| Unpaid, Accrued Interest | $100,111.36 |
| Escrow Advance | $ 68,666.06 |
| Corporate Advance | $  6,979.50 |
| Less: Partial Payments | ($       0.00) |
| Minimum Outstanding Obligations | $535,500.57 |

9. In addition to the other amounts due to Creditor reflected in this declaration, as of

the date hereof, in connection with seeking the relief requested in the Motion, Secured Creditor

has also incurred $1,026.00 in legal fees and costs. Creditor reserves all rights to seek an award

or allowance of such fees and costs in accordance with applicable loan documents and related

agreements, the Bankruptcy Code and otherwise applicable law.

3

10. The following chart sets forth the number and amount of post-petition payments due pursuant to the terms of the Note that have been missed by the Debtors:

| Number of Missed Payments | From | To | Missed Principal and Interest | Missed Escrow (if applicable) | Monthly Payment Amount | Total Amounts Missed |
|---|---|---|---|---|---|---|
| 7 | 12/1/13 | 6/1/14 | $1,768.07 | $728.78 | $2,496.85 | $17,477.95 |
| 8 | 7/1/14 | 2/1/15 | $2,634.73 | $728.78 | $3,363.51 | $26,908.08 |
| Less post-petition partial payments (suspense balance): | | | | | ($0.00) | |
| | | | | | Total: $44,386.03 | |

4

11. According to the Broker's Price Opinion, the property has a value of $155,000.00, as evidenced by the Broker's Price Opinion, attached to the Motion as Exhibit "E" and incorporated herein by reference.

12. Affiant has reviewed the exhibit attached to this Affidavit and states that it is a true and correct copy

13. The CREDITOR retained counsel Gerard M. Kouri, Jr., P.A. through Prober & Raphael, A Law Corporation, to represent it in this matter and has agreed to pay reasonable fee for said representation.

14. This concludes my affidavit.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Name: _Shemar Ursin_

Title: _Assistant Secretary_

SUBSCRIBED AND SWORN TO before _Patrick Valliere_, a Notary Public in and for _the State of TX_ on this _19th_ day of _February 2015_ by Affiant _Shemar Ursin_, who proved to me on the basis of satisfactory evidence, to be the person who appeared to be before me.

Signature _____

My Commission Expires _December 19th 2018_

PATRICK VALLIERE
Notary Public, State of Texas
My Commission Expires
December 19, 2018

5

# INDEBTEDNESS WORKSHEET

## DEBT AS OF THE PETITION DATE

**A.**     **Total pre-petition indebtedness of debtors to movant (if movant is not the lender, this refers to the indebtedness owed to the lender) as of petition filing date: $617,135.88**

   1. Amount of principal: $359,743.65

   2. Amount of interest: $85,468.69

   3. Amount of escrow (taxes and insurance): $59,165.69

   4. Amount of force-placed insurance expended by movant: $0.00

   5. Amount of attorneys' fees billed to debtors pre-petition: $3,835.00

   6. Amount of pre-petition late fees, if any, billed to debtors: $0.00

   7. Any additional pre-petition fees, charges or amounts charged to debtors' account and not listed above: $325.00 (Title Costs), $195.00 (Appraisal/Broker's Price Opinion Fees), $390.00 (Property Inspection Fees), $190.00 (Property Preservation Expenses), $351.00 (Posting Costs), $10.50 (Recording Fee)  Total: $1,461.50.

**B.**     **Contractual interest rate: 3.625% (if interest is (or was) adjustable, list the rate(s) and date(s) the rate(s) was/were in effect).**

**EXHIBIT D**

| Interest rate | From mm/dd/yyy | To mm/dd/yyy | Amount |
|---|---|---|---|
| 7.25% | 05/01/2008 | 06/30/2008 | $4,346.90 |
| 7% | 07/01/2008 | 07/31/2008 | $2,098.50 |
| 6.75% | 08/01/2008 | 08/31/2008 | $2,023.56 |
| 6.5% | 09/01/2008 | 09/30/2008 | $1,948.61 |
| 6.25% | 10/01/2008 | 10/31/2008 | $1,873.66 |
| 6.125% | 11/01/2008 | 11/30/2008 | $1,836.19 |
| 5.875% | 12/01/2008 | 12/31/2008 | $1,761.24 |
| 5.75% | 01/01/2009 | 01/31/2009 | $1,723.77 |
| 5.5% | 02/01/2009 | 02/28/2009 | $1,648.83 |
| 5.25% | 03/01/2009 | 03/30/2009 | $1,573.88 |
| 5.125% | 04/01/2009 | 04/30/2009 | $1,536.41 |
| 5% | 05/01/2009 | 05/31/2009 | $1,498.93 |
| 4.875% | 06/01/2009 | 06/30/2009 | $1,461.46 |
| 4.75% | 07/01/2009 | 07/31/2009 | $1,423.99 |
| 4.625% | 08/01/2009 | 08/31/2009 | $1,386.51 |
| 4.5% | 09/01/2009 | 09/30/2009 | $1,349.04 |
| 4.375% | 10/01/2009 | 10/31/2009 | $1,311.57 |
| 4.25% | 11/01/2009 | 11/30/2009 | $1,274.09 |
| 4.125% | 12/01/2009 | 12/31/2009 | $1,236.62 |
| 4% | 01/01/2010 | 01/31/2010 | $1,199.15 |
| 3.875% | 02/01/2010 | 10/31/2010 | $10,455.05 |
| 3.75% | 11/01/2010 | 10/31/2011 | $13,490.39 |
| 3.625% | 11/01/2011 | 11/26/2013 | $27,010.34 |
| **Total interest due as of the petition date** | | | $85,468.69 |

### AMOUNT OF ALLEGED POST-PETITION DEFAULT
### (AS OF 02/11/2015)

C.    Date last payment was received: 06/30/2008

D.    Alleged total number of payments due post-petition from filing of petition through payment due on 02/01/2015: 15

E.    All post-petition payments alleged to be in default:

| Alleged Amount Due Date: | Alleged Amount Due | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Amount Applied to Escrow | Late Fee Charged (if any) |
|---|---|---|---|---|---|---|
| 12/01/2013 | $2,496.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 01/01/2014 | $2,496.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 02/01/2014 | $2,496.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 03/01/2014 | $2,496.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 04/01/2014 | $2,496.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 05/01/2014 | $2,391.26 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 06/01/2014 | $2,391.26 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 07/01/2014 | $3,363.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/01/2014 | $3,363.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 09/01/2014 | $3,363.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/01/2014 | $3,363.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/01/2014 | $3,363.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/01/2014 | $3,363.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 01/01/2015 | $3,363.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 02/01/2015 | $3,363.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Totals: | $44,386.03 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

F.    Amount of movant's attorneys fees billed to debtor for the preparation, and filing and prosecution of this motion: $850.00

G.    Amount of movant's filing fee for this motion: $176.00

H.    Other attorneys' fees billed to debtor post-petition: $0.00

I.    Amount of movant's post-petition inspection fees: $0.00

J.    Amount of movant's post-petition appraisal/broker's price opinion: $0.00

K.    Amount of force-placed insurance or insurance provided by movant post-petition: $0.00

L.    Sum held in suspense by movant in connection with this contract, if applicable: $0.00

M.    Amount of other post-petition advances or charges (for example: taxes, insurance) incurred by debtor, etc. (itemize each charge): $0.00

Copy



# Broker Price Opinion

**VPS EXTERIOR**



| | | |
|---|---|---|
| **Subject Address** | **Client Name** | **Agent Name** |
| 316 E 41 ST | Nationstar Credit Risk Forward Default | Victor Caputo III |
| HIALEAH, FL 33013 | | |
| | **Client Address** | **Agent Company Name** |
| **Loan Number** | 350 Highland Dr. | Home Zone Realty Inc |
| REDACTED | Lewisville, TX 75067 | |
| **Inspection Date** | | |
| 01/17/2015 | | |

SOLUTIONSTAR SETTLMENT SERVICES                                      BPO FORM V1

EXHIBIT "E"

**Copy**



**SOLUTION**STAR

**BROKER PRICE OPINION**
VPS Exterior
Less REDACTED

**Subject Property Information**

| Address: | 318 E 41 ST | City: | HIALEAH | State: | FL | Zip Code: | 33013 | County: | MIAMI DADE |

Borrower: ELVIRA DOMINGUEZ    Owner of Public Record: DOMINGUEZ    Inspection Date: 01/17/2015

Property Type: SFD    Occupancy: Unknown    Inspection Type: VPS Exterior

Parcel #: 04-31-04-044-6300    HOA Fees: $0    Special Assessment Fee: $0    New Construction? No    Subject Zoning: Legal

Was the subject impacted by disaster in the past 1 ho.    Disaster Date: n/a    Is there evidence of a disaster? No

Is the subject currently listed for sale?: No    Was the subject listed for sale in the past 12 mos.?: No    Cumulative Days on Market: 0

Was the subject sold in the past 12 months?: No    Date Sold: n/a    Original List Price: ____

Last Listing Broker Name / Company: ____    Last List Price: $0    Last List Date: ____

**Brief Description of Subject Property and Comments**
The subject appears to be in average condition with no signs of deferred maintenance visible from exterior inspection.

**Subject Neighborhood Information**

Location: Urban    Property Price Trend: Stable    REO Trend: Stable    Marketing Time Trend: Stable

None of Days on Market: 61-120    Supply/Demand: Normal / Normal    Owner vs. Tenant %: 60%    Vacancy Rate: 0 TO 5    Median Market Rent: $1,800

Approximate Number of Comparable Listings: 5    Approximate Number of Comparable Listings Corporate or REO: 2

Number of Comparable Sales in the past 12 mos.?: 4    Comparable Sale Price Range: $147,000 to $229,000    Median Price: $173,000

Neighborhood Price Range: $130,000 to $230,000    Are there adverse external factors within 0.25 mi. of the subject property? No

**Adverse External Factors Comments**
None

**Neighborhood Comments**

**Red Flags**

| Construction | ☐ | Red Flag Comments |
| Damaged | ☐ | |
| Environmental | ☐ | |
| Zoning | ☐ | |
| Market Activity | ☐ | |
| Deeded | ☐ | |
| Stigma | ☐ | |
| Other | ☐ | |
| Not Applicable | ☑ | |

**Copy**

## Comparable Sales

| Feature | Subject | Comparable Sale 1 | Comparable Sale 2 | Comparable Sale 3 |
|---|---|---|---|---|
| Address | 379 E 41 ST | 3580 E 7 AV | 242 E 47 ST | 123 E 42 ST |
| City, State Zip Code | HIALEAH, FL 33013 | HIALEAH, FL 33013 | HIALEAH, FL 33013 | HIALEAH, FL 33013 |
| Data Source / MLS# | Tax data / | MLS / A2166057 | MLS / A1147011 | MLS / A2092198 |
| Proximity to Subject | | 0.41 mi | 2.26 mi | 2.06 mi |
| Original List Date/Price | / \$0 | 03/10/2014 / \$145,300 | 05/20/2014 / \$159,999 | 03/27/2014 / \$175,600 |
| Sale Date / Price | / \$0 | 03/15/2014 / \$147,000 | 05/24/2014 / \$167,000 | 12/14/2014 / \$161,375 |
| Cumulative DOM | 0 | 24 | 119 | 35 |
| Loan Type | Conventional Loan | Cash | Cash | Cash |
| Sale Type | FMV | MLO | MLO | MLO |
| Lease Hold/Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Site Size | 0.16 AC | 0.14 AC | 0.16 AC | 0.19 AC |
| Condition | Average | Average | Average | Average |
| Age | 57 | 51 | 54 | 65 |
| Gross Living Area | 1675 SqFt | 1440 SqFt | 1539 SqFt | 1615 SqFt |
| View | Neighborhood | Neighborhood | Neighborhood | Neighborhood |
| Room/Bed/Full/Partial | 6 / 3 / 2 / 0 | 6 / 3 / 2 / 0 | 7 / 4 / 3 / 0 | 6 / 3 / 1 / 0 |
| Basement Area (Sq. Ft.) | 0 SqFt | 0 SqFt | 0 SqFt | 0 SqFt |
| Basement % Finished | 0% | 0% | 0% | 0% |
| Price per Sq. Ft. | 0.00 | 102.08 | 102.06 | 105.00 |
| Parking Type | None | None | Detached 2 Car Garage | None |
| # Parking Stalls | None | None | 2 | None |
| Amenities (Pool, etc.) | | | | |
| Overall Comparability | | Equal | Equal | Equal |
| Sales Concessions | \$0 | \$0 | \$0 | \$0 |
| Special Assessments | \$0 | \$0 | \$0 | \$0 |
| # of Units / Design | 1 / Ranch/Rambler | 1 / Ranch/Rambler | 1 / Ranch/Rambler | 1 / Ranch/Rambler |
| Heating / Cooling | Both | Both | Both | Both |
| Water / Sewer | City / City | City / City | City / City | City / City |

## Comparable Listings

| Feature | Subject | Comparable Listing 1 | Comparable Listing 2 | Comparable Listing 3 |
|---|---|---|---|---|
| Address | 379 E 41 ST | 222 E 44 ST | 535 E 44 ST | 3580 E 7 AV |
| City, State Zip Code | HIALEAH, FL 33013 | HIALEAH, FL 33013 | HIALEAH, FL 33013 | HIALEAH, FL 33013 |
| Data Source / MLS# | Tax data / | MLS / A2043175 | MLS / A2013193 | MLS / A1447054 |
| Proximity to Subject | | 0.05 mi | 1.35 mi | 0.41 mi |
| Original List Date/Price | / \$0 | 12/05/2014 / \$149,000 | 11/20/2014 / \$199,000 | 05/08/2014 / \$155,000 |
| Listing Date / Price | / \$0 | 01/16/2015 / \$149,000 | 01/19/2015 / \$145,000 | 07/10/2015 / \$155,000 |
| Cumulative DOM | 0 | 40 | 11 | 254 |
| Loan Type | Conventional Loan | Conventional Loan | Conventional Loan | Conventional Loan |
| Listing Type | FMV | Short Sale | Short Sale | Short Sale |
| Lease Hold/Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Site Size | 0.16 AC | 0.16 AC | 0.19 AC | 0.19 AC |
| Condition | Average | Average | Average | Average |
| Age | 57 | 65 | 51 | 65 |
| Gross Living Area | 1675 SqFt | 1631 SqFt | 1615 SqFt | 1605 SqFt |
| View | Neighborhood | Neighborhood | Neighborhood | Neighborhood |
| Room/Bed/Full/Partial | 6 / 3 / 2 / 0 | 6 / 3 / 2 / 0 | 7 / 4 / 2 / 0 | 6 / 3 / 2 / 0 |
| Basement Area (Sq. Ft.) | 0 SqFt | 0 SqFt | 0 SqFt | 0 SqFt |
| Basement % Finished | 0% | 0% | 0% | 0% |
| Price per Sq. Ft. | 0.00 | 89.31 | 116.54 | 89.73 |
| Parking Type | None | None | None | None |
| # Parking Stalls | None | None | None | None |
| Amenities (Pool, etc.) | | | | |
| Overall Comparability | | Equal | Equal | Equal |
| Sales Concessions | \$0 | \$0 | \$0 | \$0 |
| Special Assessments | \$0 | \$0 | \$0 | \$0 |
| # of Units / Design | 1 / Ranch/Rambler | 1 / Ranch/Rambler | 1 / Ranch/Rambler | 1 / Ranch/Rambler |
| Heating / Cooling | Both | Both | Both | Both |
| Water / Sewer | City / City | City / City | City / City | City / City |

**Copy**

## Comparable Sales and Listings Comments

**Comparable Sale 1**
LOCKBOX CLICK ON SHOWING ASSIST. A SPACIOUS 1,465SQ FT 1 STORY SINGLE FAMILY HOME THAT STANDS ON 6,325SQ FT LOT LOCATED IN IDEAL HIALEAH WITH NO ASSOCIATION. THIS HOME FEATURES 3 BEDROOMS AND 2 BATHROOMS, LIVING AREA, DINING IN KITCHEN AND FENCED BACKYARD, JUST A FEW MINUTES AWAY FROM PARKS, SCHOOLS, RESTAURANTS AND SHOPPING CENTERS HURRY!! **TENDER OFFERS ON OUR WEBSITE** SUBMIT ATTACHMENTS FOR DISCLOSURES & FURTHER MLS TERMS. IF RECEIVED RESPONSE TO YOUR OPERATIONS VIA EMAIL.

**Comparable Sale 2**
AMAZING INVESTOR OPPORTUNITY. BUYER RESPONSIBLE FOR ANY OPEN PERMITS OR CODE VIOLATIONS. ***CASH ONLY***

**Comparable Sale 3**
Cute one story home centrally located East Hialeah house. 3 bedrooms, 2 bathrooms. Property is occupied and occupants are not to be disturbed or contacted under any circumstances. Interior inspections are not available, and property is being sold as is. Property is on thru an auction. Please contact the listing agent for bidding instructions. Seller will offer a $750 credit to the buyer at closing.

**Comparable Listing 1**
Hialeah single family home, located close to Milander Park. Property is in need of TLC, but has great potential.

**Comparable Listing 2**
Beautiful. 4br house This is a short sale Commission will be split 50/50

**Comparable Listing 3**
NICE PROPERTY IN HIALEAH SHORT SALE 2/2

**Copy**

| Repairs | | |
|---|---|---|
| Painting | | Estimated Cost of Repair $0 |
| Foundation | | Estimated Cost of Repair $0 |
| Landscaping | | Estimated Cost of Repair $0 |
| Roof | | Estimated Cost of Repair $0 |
| Windows | | Estimated Cost of Repair $0 |
| Other | | Estimated Cost of Repair $0 |
| Pool | | Estimated Cost of Repair $0 |
| Cleaning/Trash Removal | | Estimated Cost of Repair $0 |

Total Repair Cost __ $0

| Price Opinion | Price Opinion | Suggested List Price | | |
|---|---|---|---|---|
| As Is | $155,000 | $163,000 | Market Rent | $1,800 |
| As Repaired | $155,000 | $163,000 | | |
| Quick Sale | $147,000 | $154,000 | Land Value | $43,011 |

**Additional Comments**

The subject property is bracketed well by the comps. The property should be priced around the comps and then reduce price if necessary, to continuously attract more buyers. Along with aggressive pricing, pre-marketing consisting of yard signage - placing open house comments a soft, posting on numerous websites. Direct contact of neighbors, etc.

**Broker / Agent Signature**

| | | Prepared By | Victor Caputo III |
|---|---|---|---|
| Signature | | Signature Date | 01/13/2015 |
| Broker/License Number | BK3292155 | Broker/License State | FL |
| Company | Home Zone Realty Inc | Company Address | 302 Maple Ave, Downers Grove, IL 60515 |

**Disclaimer**

* This evaluation was prepared by a licensed real estate broker and is not an appraisal. This evaluation meant the one for the purpose of obtaining financing. *

* Notwithstanding any prepared language to the contrary, this is not an appraisal of the market value of the property, if an appraisal is desired the services of a licensed or certified appraiser must be obtained. *

**Copy**

| Agent Comments | |
|---|---|
| Please explain: Listed 2 listing value has exceeded the allowable threshold of value variance to the subject (15%) | Due to the limited number of comps in the local market it was necessary to use a comparable that was slightly outside the allowable price threshold. Nonetheless it brackets the subject well in regards to size, style and condition and provides an accurate evaluation. |
| Please explain: Sold 3 has exceeded the threshold for age variance between subject and comp (5 years) | The effective age and condition of the subject is the same for the subject and comparables. These comparables bracket the subject well and render the same value to a potential buyer. |
| Please explain: Listed 1 has exceeded the threshold for age variance between subject and comp (5 years) | The effective age and condition of the subject is the same for the subject and comparables. These comparables bracket the subject well and render the same value to a potential buyer. |
| Please explain: Listed 3 has exceeded the threshold for age variance between subject and comp (5 years) | The effective age and condition of the subject is the same for the subject and comparables. These comparables bracket the subject well and render the same value to a potential buyer. |
| Please explain why Listing 1 Sale Type varies from what client requested(Retail (FMV) comps) | Due to limited comps and the increasing number of foreclosure/short sale properties in the subject's area, it is likely to have to use a comp that is not fair market. Nonetheless the comps are in line with the subject and provide an accurate opinion of value. |
| Please explain why Listing 2 Sale Type varies from what client requested(Retail (FMV) comps) | Due to limited comps and the increasing number of foreclosure/short sale properties in the subject's area, it is likely to have to use a comp that is not fair market. Nonetheless the comps are in line with the subject and provide an accurate opinion of value. |
| Please explain why Listing 3 Sale Type varies from what client requested(Retail (FMV) comps) | Due to limited comps and the increasing number of foreclosure/short sale properties in the subject's area, it is likely to have to use a comp that is not fair market. Nonetheless the comps are in line with the subject and provide an accurate opinion of value. |
| Please explain why Sale 1 Sale Type varies from what client requested(Retail (FMV) comps) | Due to limited comps and the increasing number of foreclosure/short sale properties in the subject's area, it is likely to have to use a comp that is not fair market. Nonetheless the comps are in line with the subject and provide an accurate opinion of value. |
| Please explain why Sale 2 Sale Type varies from what client requested(Retail (FMV) comps) | Due to limited comps and the increasing number of foreclosure/short sale properties in the subject's area, it is likely to have to use a comp that is not fair market. Nonetheless the comps are in line with the subject and provide an accurate opinion of value. |
| Please explain why Sale 3 Sale Type varies from what client requested(Retail (FMV) comps) | Due to limited comps and the increasing number of foreclosure/short sale properties in the subject's area, it is likely to have to use a comp that is not fair market. Nonetheless the comps are in line with the subject and provide an accurate opinion of value. |

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In Re:

Wilford D Miranda,
aka Wilford D Miranda
aka Wilford Miranda, and
Elvira Dominguez,
aka Elvira Alejandrina Dominguez
aka Elvira A. Dominguez,

        Debtors.

Case No.: 13-38414-JKO

CHAPTER 13

## ORDER GRANTING DEUTSCHE BANK NATIONAL TRUST COMPANY AMERICAS, AS TRUSTEE FOR MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-QO4'S MOTION FOR RELIEF FROM STAY

**THIS CAUSE** coming before the Court on _____ at _____ on Deutsche Bank National Trust Company Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4's Motion for Relief from Stay. Upon consideration of the motion

Proposed order

and the record, it is

**ORDERED** that:

1.  The Motion for Adequate Protection is DENIED.

2.  The Motion for Relief from Stay filed by CREDITOR, is **GRANTED** and the stay imposed by 11 U.S.C. §362 is modified, so as to allow CREDITOR to foreclosure its interest in the real property, located at 318 E 41 ST., Hialeah, FL 33013 and legally described as follows, up and through a final judgment of foreclosure and sale, and issuance and execution of the writ of possession:

LOT 19, BLOCK 4, CHURCHILL DOWNS, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOK 12 AT PAGE 19, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

3.  The stay is modified for the purpose of allowing CREDITOR to foreclosure its interest in the real property, up and through a final judgment of foreclosure and sale, and issuance and execution of the writ of possession. CREDITOR shall not seek nor obtain any *in personam* judgment against the debtor.

4.  That, in addition to foreclosure, this Relief Order permits activity necessary to obtain possession of said collateral; therefore, Deutsche Bank National Trust Company Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4 is permitted to engage in loss mitigation activity, including short payoff, short sale and the obtaining of a deed-in-lieu of foreclosure including authorization to negotiate inferior liens. Deutsche Bank National Trust Company Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4 is further permitted to send information regarding these loss mitigation options directly to the debtor.

5. Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure is not applicable and creditor may immediately enforce and implement this order granting relief from the automatic stay.

###

Copies furnished via ECF to:
Gerard M. Kouri, Jr., Esq., attorney for Creditor
Patrick L Cordero, Esq., attorney for Debtors
Robin R Weiner, Trustee